UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| 290 Farmington Avenue, L.L.C., et al.,<br>    Plaintiffs,<br><br>v.<br><br>Town of Plainville et al.,<br>    Defendants. | <br><br><br><br>Case No. 3:05cv1232 (JBA)<br><br> |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 47]**

Plaintiffs 290 Farmington Avenue, L.L.C. ("290 Farmington" or the "L.L.C."), its manager, Jeffrey Langan, and the owner of the property at 290 Farmington Avenue in Plainville, Connecticut that rented the facility to the L.L.C., Walter Bartkiewicz, initiated this action against the Town of Plainville (the "Town") and various members of its police department pursuant to 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution alleging selective enforcement of the law against the nightclub operated by the L.L.C. (the "Club" or "Club 290") on the basis of the race/ethnicity of certain of its patrons. See Compl. [Doc. # 1]. Defendants now move for summary judgment contending, inter alia, that plaintiffs cannot sustain their claim of selective enforcement in violation of the Equal Protection Clause because there were no other establishments existing in Plainville at the time which were similarly situated to Club 290. See Defs. Mot. [Doc. # 47]. Plaintiffs oppose defendants' Motion, contending,

1

inter alia, that whether Club 290 was similarly situated to its purported comparators is a question for the jury. Because the Court finds defendants' argument concerning a lack of comparators similarly situated to Club 290 meritorious, it need not reach defendants' other arguments,[1] and their Motion will be granted.

## I.  Factual Background

The following facts are undisputed, unless otherwise noted. Plaintiff 290 Farmington operated Club 290 from May 2004 until June 2006. In 2004, there were 19 establishments with liquor licenses in the Town and Club 290 was the largest among them, with a maximum legal capacity of 411 people. See Bartkiewicz Dep. at 154, 185; Coppinger Dep. at 36; Marques Dep. at 30. There were no other clubs in the Town with a capacity similar to that of Club 290, with the next largest (the Déjà Vu Café) having a maximum legal capacity of 120-130 people. Coppinger Dep. at 36. Club 290 was located in close proximity to single family homes, the owners/residents of which made noise complaints about the Club on nights it was open. See Coppinger Dep. at 31;

---

[1] Defendants also argue that plaintiffs cannot sustain their claim of selective enforcement because any differential treatment by defendants of plaintiffs' patrons was not motivated by impermissible considerations such as race/ethnicity, that the individual defendants are entitled to qualified immunity, that the plaintiffs are unable to sustain a § 1983 claim against the Town because the defendant police officers were not acting pursuant to municipal policy or custom, and that plaintiffs should be precluded from pursuing a claim for compensatory damages as the result of their deliberate and willful disregard of their discovery obligations.

2

Marques Dep. at 41; Mullaney Dep. at 32.  While in operation, Club 290 held theme nights designed to attract specific groups of patrons, including weekly "College Nights" on Thursdays from September through late December 2004, and "Latin Nights" on Fridays and Saturdays beginning in November 2004.  See Langan Dep. at 63-65; Marques Dep. at 24-25, 31.  The estimated average attendance at the College Nights was 275-400 patrons, the estimated average attendance at the Latin Nights was 400 patrons, and the estimated average attendance on non-theme nights was 90 patrons.  See Langan Interrog. Resp. No. 7; Langan Dep. at 44.

After Club 290 began to hold College Nights in September 2004, Langan complained to Bartkiewicz that the police were "giving [him] a problem over College Night" because they "d[idn't] like the kids" and the Town did not have sufficient police officers to handle "those kind of kids."  Bartkiewicz Dep. at 63.  Police Chief Coppinger also told Bartkiewicz that College Night was "bringing in too many kids to the town for such a small town with such a small police department."  Id. at 66.  The plaintiffs complained that police officers were "in and out" of the Club's parking lot every Thursday night, that they were unreasonably checking IDs of the patrons, and that they searched cars in the Club's parking lot on both College and Latin Nights.  Bartkiewicz Dep. at 76-78, 83, 118; Langan Dep. at 50-51, 54-55, 79-80.  Plaintiffs also subsequently complained to Chief

Coppinger that Town police officers were "hassling" and "harassing" College Night patrons, see Bartkiewicz Dep. at 75; Langan Dep. at 55-56, and there was an incident of a fight breaking out in Club 290's parking lot, necessitating Town police officers to call for assistance from other local law enforcement in order to break up the fight, see Bartkiewicz Dep. at 95-97, 147-48. On Chief Coppinger's suggestion, Club 290 eventually hired an off-duty police officer to help with security on College Nights; after the Club started holding Latin Nights and those nights got "very busy", the Club hired an off-duty officer for these nights as well. Id. at 99, 101-02, 106.

During December 2004, multiple serious assaults took place at Club 290, many on Latin Nights. See Costanzo Dep. at 23-24, 27-28; Mullaney dep. at 21. Many of the individuals arrested in connection with these incidents indicated that they had gang affiliations, Town police officers received information that the Club was a "regular hangout" for members of some gangs, see Costanzo Dep. at 24; Marques Dep. at 48, and some Town police officers observed gang members in attendance at the Club, see Marques at 93; Mullaney at 22. Additionally, officers often observed fights outside of the Club, see Mullaney Dep. at 44, and during Latin Nights (Fridays and Saturdays) in November and December 2004, the Club was "the most violent area" in the Town, Costanzo Dep. at 46.

After Christmas in 2004, when Bartkiewicz met with Chief Coppinger and Captain Costanzo to discuss the ongoing problems at the Club, the police officers stated that the crowds at the Club were too large for the Town's police department to handle and indicated that the Town was going to commence a nuisance abatement proceeding to shut down the Club, which type of proceeding had previously shut down other clubs in the Town. Bartkiewicz Dep. at 108, 122; Costanzo Dep. at 59-60. As a "compromise," Coppinger agreed not to pursue the nuisance abatement action if the Club would stop advertising Latin Night, and Bartkiewicz acquiesced. See Bartkiewicz Dep. at 108, 124, 129-33; Langan Dep. at 86-88; Langan Interrog. Resp. No. 12.

Notwithstanding this agreement and the cessation by plaintiffs of advertising Latin Nights, Fridays and Saturdays continued to be popular nights at Club 290, see Bartkiewicz Dep. at 127, 182-83; in 2005 and 2006, both Bartkiewicz and Langan were arrested for overcrowding at the Club, see Bartkiewicz Dep. at 14-16; Langan Dep. at 68-70. Moreover, the Club and its patrons were still being "harassed" by police officers on weekend nights, continuing "until the day [the Club] was sold." Bartkiewicz Dep. at 182-83. Plaintiffs thus claim that "[t]he defendants, each of them, has established a policy, pattern, practice and custom of attempting either to close Club 290 or to deter it from offering promotional events catering to Latinos,

5

and to that end has engaged in a pattern of selective enforcement of the law, intimidation and harassment of the Club's Latino patrons." Compl. ¶ 21.

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). The duty of the court is to determine whether there are issues to be tried and, in making that determination, the Court must draw all factual inferences in favor of the party opposing the motion, viewing the factual disputes among materials such as affidavits, exhibits, and depositions in the light most favorable to that party. Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54,

59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence

7

that would be sufficient to support a jury verdict in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

## III. Discussion

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. . . . The Supreme Court recently affirmed the validity

8

of such 'class of one' claims 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).

To prevail on a claim of selective enforcement, such as the claim here, plaintiffs must show: "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. (internal citations omitted). Although the parties appear to misapprehend the correct standard to be applied in assessing the similarity of alleged comparators,[2] comparators claimed to be "similarly situated" in a "class of one" equal protection claim must be shown to be "prima facie identical" to the plaintiffs, such that "no rational person could regard the circumstances of the plaintiff[s] to differ from those of a comparator to a degree

---

[2] Although both plaintiffs and defendants cite cases concerning the degree of similarity required for comparators in the employment/Title VII context, see Defs. Mem. at 14-15; Pls. Opp. at 5, a standard requiring a higher degree of similarity is imposed in "class of one" Equal Protection Clause claims. See Neilson, infra.

9

that would justify the differential treatment on the basis of a legitimate government policy" and "the similarity in circumstances and difference in treatment [must be] sufficient to exclude the possibility that the defendant[s] acted on the basis of a mistake." Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005). "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury," however, "[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs., 273 F.3d at 499 n.2.

Here, while plaintiffs contend that the issue of sufficiency of similarity should go to the jury, the undisputed evidence shows that the Club was markedly larger in size – measured both by its legal maximum capacity and by patron attendance – than any of its comparators. The Club's maximum capacity was 411 people and it regularly brought in nearly that many people on Thursday through Saturday Nights, whereas its closest competitor in terms of size, Déjà Vu Café, had a maximum capacity of only 120-130. Indeed, Langan himself testified that "[t]he only thing that's similar to [the Club] [in terms of capacity] is probably Déjà Vu across the street," but when asked "[t]hey're not as big as you guys, though, right?" Langan responded, "[n]ot even remotely close, no." Langan Dep. at 105-06. The undisputed evidence is

10

also that the Town did not have sufficient police officers available for duty to handle the number of patrons frequenting Club 290 and the related number of incidents necessitating police attention.

Accordingly, even viewing the evidence in the light most favorable to them, plaintiffs lack sufficient evidence to establish at trial that the Club was prima facie identical to the comparators which they claim were treated differently – based on the undisputed evidence of differences between the Club and its alleged comparators, no rational juror could conclude that the claimed differential treatment was unjustified. The undisputed evidence shows a substantial distinction in maximum capacity and attendance between the Club and its purported comparators, resulting in a greater volume of recurring incidents requiring police attention than the Town's police department could handle, and thus warranting the claimed differential treatment, including the threatened nuisance abatement proceeding. Moreover, defendants' evidence of similarity of treatment, namely police activity at other clubs in the Town during the same time period, see Pls. Ex. C (complaints reflecting police activity at Déjà Vu Café and Long Shots Café from May 2004 through June 2006); Costanzo Dep. at 47; Coppinger Dep. at 36, Marques Dep. at 62, 92, as well as nuisance abatement proceedings commenced (and some maintained successfully to conclusion) against other clubs in the

Town, see Costanzo Dep. at 59-60, is unrebutted by plaintiffs. Thus, there is no evidence demonstrating any disputed issue of material fact which, if credited by the jury, could enable plaintiffs to prevail at trial on the first prong of their "class of one" selective enforcement Equal Protection Clause claim.

**IV. Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 47] is GRANTED. The Clerk is directed to CLOSE this case.

                            IT IS SO ORDERED.

                              /s/
                        Janet Bond Arterton
                        United States District Judge

**Dated at New Haven, Connecticut this 30th day of April, 2007.**